## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

|  |  |  |
|---|---|---|
| CHANTAL LACASSE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:15-cv-01358 |
| | ) | |
| DIDLAKE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OPINION

THIS MATTER comes before the Court on Defendant Didlake, Inc.'s Motion for Summary Judgment.

Plaintiff Chantal Lacasse alleges eight causes of action based on her sixteen months of employment with Defendant Didlake, Inc. ("Didlake"): Count I, battery; Count II, assault; Count III, false imprisonment; Count IV, intentional infliction of emotional distress; Count V, hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII"); Count VI, retaliation based on sex pursuant to Title VII; Count VII, discrimination in violation of the Americans with Disabilities Act, as amended ("ADA"); and Count VIII, retaliation in contravention of the ADA.

Defendant Didlake is a 501(c)(3) organization providing services and employment opportunities to people with

disabilities. Didlake creates opportunities by for
rehabilitative services, employment options, and other
assistance to persons with disabilities in Virginia, Maryland,
the District of Columbia, and Pennsylvania. In 2015, Didlake
served more than 2,000 people with disabilities and directly
employed over 800 persons with disabilities through its
janitorial services contracts with the federal government.

Plaintiff is a 26-year old female with epilepsy and
learning disabilities. In 2011, the Virginia Department of Aging
and Rehabilitative Services ("DARS") determined that Plaintiff
was eligible to work in a supported employment environment and
referred her to Didlake for assistance. Plaintiff began working
with Didlake to find a supported employment position. Such a
position involves performing a mainstream job with the
assistance of an employment specialist who is also known as a
"job coach." Plaintiff's employment specialist was Lyn Cardona,
a Didlake employee in its Rehabilitative Services Department.
Ms. Cardona assisted Plaintiff in finding a part-time job, among
other services, and initially found her a position working at
Giant. After a period of employment with Giant, including
ongoing employment support services from Ms. Cardona, Plaintiff
lost that job.

On or about January 28, 2013, Plaintiff secured a job
working for Didlake at the Defense Logistics Agency ("DLA").

2

Plaintiff was hired to work as a janitor from 8 a.m. until 12 p.m. Plaintiff was responsible for independently cleaning stairwells under the direct supervision of Didlake Janitorial Supervisor Brenda Morales. Ms. Cardona provided employment support services for Plaintiff and visited her onsite several times monthly. Ms. Morales worked with Ms. Cardona to provide the first opportunity to correct any improper workplace behavior by the Plaintiff.

Ms. Morales, in turn, was supervised by Didlake Project Manager Roy Evo. When Didlake hired Mr. Evo in 2009, he had more than twenty years of relevant experience and positive professional references. Based on his favorable performance, Didlake assigned Mr. Evo to be DLA Project Manager in 2011. Mr. Evo was primarily responsible for ensuring that the government customer was satisfied with Didlake's onsite work. Throughout his four-year tenure with Didlake, Mr. Evo received consistently positive performance appraisals, was never disciplined, and was never the subject of complaints or allegations against him prior to Plaintiff's allegations.

Didlake maintains a sexual harassment policy, and reviews the policy with each employee upon hire. Plaintiff received a copy of this policy, among other pertinent Didlake policies and procedures, when she began work at DLA. Mr. Evo, likewise, received a copy. He signed off on his understanding of the

policy when he began working for Didlake. Further, Didlake's Human Resources Department conducted sexual harassment training at DLA during Plaintiff's tenure on March 20, 2013. This training involved reviewing the policy through a PowerPoint presentation and small group discussions.

DLA is a secure federal facility with restricted access. In order to work for Didlake at DLA, employees must be screened by the federal government and issued access badges. Plaintiff alleges that on August 15, 2013 toward the end of her shift—between 11 a.m. and 12 p.m.—Mr. Evo found her in a supply closet, closed the door, kissed her, and while restraining her with his hands managed to undo his belt, pull his pants down, undo Plaintiff's belt, and pull her pants down. Plaintiff alleges that the incident ended abruptly because someone knocked on the closet door, though no one was present when the door opened.

On August 17, 2013, (a Saturday), Plaintiff informed her parents that Mr. Evo kissed her. She did not offer more information. Plaintiff's parents did not report Plaintiff's statement to Didlake. She came to work as usual the following Monday, August 19, 2013.

On August 19, 2013, Plaintiff shared her story with two individuals. Plaintiff told a non-supervisory janitorial coworker and someone who assists at the DLA site, but is not an

employee of Didlake, that Mr. Evo kissed her. Those individuals relayed the information to Mr. Evo, who promptly reported Plaintiff's statements to Didlake's Human Resources Department. Because the report came at the end of Plaintiff's work shift, Human Resources arranged to interview her the following day.

On the morning of August 20, 2013, Didlake's Manager of Labor and Employee Relations, Susie Kennedy, and Plaintiff's job coach, Ms. Cardona, met privately with Plaintiff to try to determine her claim. Plaintiff relayed that she and Mr. Evo were in a closet together toward the end of her shift on August 15, 2013, and that he kissed her, pulled his pants down and pulled her pants down. Plaintiff stated—for the first time—that Mr. Evo kissed her on another unknown occasion in July 2013. Immediately after receiving this information, Ms. Cardona called Plaintiff's mother and escorted Plaintiff to her transportation so that she could go home. Didlake placed Plaintiff on paid administrative leave to ensure she did not have any further opportunity to see or be contacted by Mr. Evo during the investigation.

To complete her investigation, Ms. Kennedy spoke with potential witnesses, including Mr. Evo. She confirmed that Mr. Evo was with other people during the time in question on August 15, 2013. When Ms. Kennedy spoke with Mr. Evo, he denied that he ever kissed Plaintiff or did any of the things that she reported. Ms. Kennedy learned that Mr. Evo was conducting

interviews for several open positions during the timeframe in question. This information was confirmed by a job coach employed by an entity other than Didlake, who was participating in the interviews, as well as Didlake's administrative assistant at the DLA site.

Ms. Kennedy drafted a report about her investigation. That report was provided to her supervisor, Trisha Juerling, and other members of Didlake's senior staff. Because there were no eyewitnesses, Mr. Evo specifically denied the allegations, and Mr. Evo had a confirmed alibi, Ms. Kennedy found that Didlake could not corroborate Plaintiff's allegations. To conclude Didlake's investigation, on September 4, 2013, Ms. Kennedy met with Mr. Evo and issued him a memorandum outlining the importance of reporting any potentially inappropriate interactions or communication to Human Resources.

In addition to Ms. Kennedy's efforts on behalf of Didlake's Human Resources Department, Ms. Cardona completed an incident report about Plaintiff's allegations, which went to her supervisor and served as part of the basis for a memorandum jointly drafted by the Head of Human Resources and the Head of the Rehabilitation Services Department. This memorandum was provided to Didlake's then-CEO and was completed in accordance with Didlake's Policy and Procedure on Abuse, Neglect and Exploitation. To ensure that Plaintiff's rights were fully

safeguarded, Didlake's Rehabilitation Services Department informed Fairfax County Adult Protective Services ("APS") about Plaintiff's claims and ensured that Didlake cooperated with any further inquiry APS conducted.

Didlake learned that the federal government was conducting its own investigation of Plaintiff's claims and cooperated with that investigation. Federal authorities determined that Mr. Evo's site badge should be temporarily suspended. In response, Didlake placed Mr. Evo on administrative leave on September 6, 2013.

On September 11, 2013, Didlake sent a letter to Plaintiff advising her of the pending status of the investigations, and providing resources for assistance and support.

On September 30, 2013, Plaintiff returned to work after a paid leave of absence. On her first day back, Plaintiff met with Ms. Cardona, Ms. Morales and Ms. Kennedy to review how she could report any concerns about people's behavior to her supervisor or Human Resources. Didlake arranged for an exception to the DLA policy so that Plaintiff could carry her cell phone at all times. Plaintiff accepted Didlake's additional offer to work alongside an experienced female worker to ease her transition. Plaintiff reported being very happy working with that employee.

Plaintiff received a time study every six months at DLA. The November 22, 2013 time study revealed that her

productiveness on the job improved from 65 percent to 89 percent. As a result, Plaintiff's salary was increased from $7.69 per hour to $10.53 per hour.

In December 2013, Didlake placed experienced project manager Egberto Garcia at the DLA site to permanently replace Mr. Evo. As the Project Manager, Mr. Garcia issued Plaintiff several disciplinary warnings, which culminated in a three-day suspension in late April of 2014.

Lacasse received the first written counseling in December 2013 when her supervisor, Ms. Morales, found her socializing with DLA security guards during a non-break time outside of Plaintiff's assigned work area.

On February 20, 2014, Mr. Garcia issued Plaintiff another piece of written counseling when a disabled African American employee who is mentally retarded and has spastic tendencies complained that Plaintiff called him a "monkey" repeatedly. On April 9, 2014, Mr. Garcia again counseled Plaintiff for unacceptable name-calling when a male Didlake employee complained that Plaintiff was emasculating him by calling him female names such as "Granny" and "Benita" during work hours at DLA.

Plaintiff spread a rumor that a Didlake employee was pregnant with the child of another Didlake employee, who was dating a third Didlake employee. Despite prior counseling, Mr.

Garcia put Plaintiff on a three-day paiud suspension. By policy, Didlake suspends disabled employees when prior counseling does not resolve ongoing behavioral issues so that employees can regroup and become successful in the workplace.

Before Mr. Garcia became Project Manager, Plaintiff struggled conducting herself appropriately in the workplace. She was informally counseled accordingly. Plaintiff spent work time socializing with fellow Didlake and DLA employees rather than cleaning the stairwells. Didlake employees raised a concern about Plaintiff's behavior. In Ms. Kennedy's estimation, "It is when other individuals are being hurt by her behaviors that different action was taken."

Plaintiff voluntarily resigned from Didlake on May 19, 2014. Plaintiff reports that she was unhappy with her job because she felt that "no one was talking to her." While she heard no words to that effect, she believes that coworkers were talking about her when she clocked in and clocked out. In the months preceding her resignation, Didlake's records demonstrate that Plaintiff engaged in name-calling with several employees and spread rumors about them.

When Plaintiff expressed that she no longer wanted to work at the DLA, Didlake sought to arrange a meeting to determine next steps and strategies for Didlake to assist her with finding

another supported employment position. Plaintiff declined to participate and ended her relationship with Didlake.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment will be granted unless "a reasonable jury could return a verdict for the nonmoving party" on the evidence presented. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An otherwise properly supported summary judgment motion will not be defeated by the existence of a dispute as to immaterial facts; only disputes over facts that might affect the outcome of the trial will properly preclude the entry of summary judgment. Id. at 248.

Plaintiff bears the initial burden of proof as to each and every element of his claims. See United States ex rel. Berge v. Bd. of Trustees of the Univ. of Alabama, 104 F.3d 1453, 1462 (4th Cir. 1997). "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (internal citation omitted) (internal quotation marks omitted); Hoschar v. Appalachian Power Co., 739 F.3d 163, 169 (4th Cir. 2014).

Plaintiff's claims for assault, battery, false imprisonment, and intentional infliction of emotional distress

10

rely on a theory of respondeat superior liability to impute
Defendant Didlake for the alleged actions of Mr. Evo against
Plaintiff. There is no such liability in this case.

In Virginia, "an employer is liable for the tortious acts
of its employee if the employee was performing his employer's
business and acting within the scope of his employment when the
tortious acts were committed." Plummer v. Ctr. Psychiatrists,
Ltd., 476 S.E.2d 172, 173 (Va. 1996). Here, Mr. Evo's alleged
actions fall outside the scope of his employment.

Virginia recognizes a scope of employment where

> (1) it was expressly or impliedly directed by the
> employer, or is naturally incident to the business,
> and (2) it was performed, although mistakenly or ill-
> advisedly, with the intent to further the employer's
> interest, or from some impulse or emotion that was the
> natural consequence of an attempt to do the employer's
> business, "and did not arise wholly from some
> external, independent, and personal motive on the part
> of the [employee] to do the act upon his own account."

Kensington Assocs. v. West, 362 S.E.2d 900, 901 (Va. 1987)
(internal citation omitted). Here, the only potential impetus
for Mr. Evo's alleged actions would have been some "personal
motive" that prompted him to act of his own volition. Id. at
901. When an assault "is personal to the employee . . . the
injury does not arise out of the employment." Richmond
Newspapers, Inc. v. Hazelwood, 457 S.E.2d 56, 58 (Va. 1995).
Counts I-IV must therefore fail for lack of respondeat superior
liability.

Count 5 is a claim for hostile work environment under Title VII of the Civil Rights Act of 1964. Title VII prohibits sexual harassment "sufficiently severe or pervasive 'to alter the conditions of [Plaintiff's] employment and create an abusive working environment.'" Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982)). An employer may be held liable under Title VII when the employer itself engages in or acquiesces illegal sexual harassment. See Garber v. Saxon Business Prod., Inc., 552 F.2d 1032 (4th Cir. 1977) (per curiam). Plaintiff presents no evidence that Didlake engaged in illegal sexual harassment. Neither did Plaintiff present any evidence that Didlake acquiesced the alleged behavior: to the contrary, the record is clear that even Mr. Evo himself immediately reported the allegations himself, and Didlake's response was thorough.

To prevail on a Title VII hostile work environment claim, Plaintiff must establish four elements: unwelcomed conduct; based on her gender; sufficiently severe or pervasive to alter the conditions of employment and to create a hostile work environment; and some basis for imputing liability to Defendant. Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 266 (4th Cir. 2001). Even assuming arguendo that the first three elements were met, Plaintiff cannot establish a basis for imputing liability to Didlake.

Within the Fourth Circuit, an employer is liable for a sexually hostile work environment created by a supervisor or other employee only when the employer knew or should have known of the illegal conduct and failed to take prompt and adequate remedial action. See Spicer v. Virginia Dep't of Corrections, 66 F.3d 705, 710 (4th Cir. 1995); Swentek v. USAir, Inc., 830 F.2d 552, 558 (4th Cir. 1987); Katz v. Dole, 709 F.2d 251, 255-56 (4th Cir. 1983). To the contrary, in the case at bar, Didlake took prompt action by investigating Plaintiff's claims and reporting her statements both to APS and to Plaintiff's mother. Didlake remediated the allegations by ensuring that Plaintiff had no further potential contact with Mr. Evo.

"[W]here an employer implements timely and adequate corrective measures after harassing conduct has come to its attention, vicarious liability should be barred regardless of the specific motivation for the wrongdoing or the particular cause of action." Dennis v. County of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995). Because Defendant Didlake did implement such corrective measures, vicarious liability is barred and Count V fails.

Count VII is a claim for discrimination in violation of the Americans with Disabilities Act, as amended. To establish a prima facie case of disability discrimination, "a plaintiff must prove: (1) that [s]he has a disability; (2) that [s]he otherwise

qualified for the employment or benefit in question; and (3) that [s]he was excluded from the employment or benefit due to discrimination solely on the basis of the disability." Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1265 (4th Cir. 1995) (citing Gates v. Rowland, 39 F.3d 1439, 1445 (9th Cir. 1994)). Turning to the third element, Plaintiff fails to provide evidence that she was excluded from employment or benefit whatsoever, let alone due to disability discrimination. Plaintiff did not suffer adverse employment action. To the contrary, she was placed on paid administrative leave pending an investigation and was only disciplined for her own alleged inappropriate conduct against coworkers. Further, where Plaintiff asserts that an unpleasant work environment caused her to resign, constituting constructive discharge, she fails to meet a reasonable burden for that argument.

To prove constructive discharge, Plaintiff must show that her employer's actions were deliberate and that working conditions were objectively intolerable. Heiko v. Colombo Savings Bank, F.S.B., 434 F.3d 249, 262 (4th Cir. 2006). An employer's actions are "deliberate" only if they were intended to force the employee to quit. Id. (internal citation omitted). The objective inquiry asks whether a reasonable person would find the conditions described to be intolerable. Id. "Dissatisfaction with work assignments, a feeling of being

14

unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994) (internal citation omitted).

A reasonable jury could not find that Plaintiff experienced conditions which were objectively intolerable. Plaintiff's claims fall short of what the Fourth Circuit deems a sufficient showing of constructive discharge. See, e.g., Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004) (plaintiff's allegations were insufficient to support a constructive discharge claim even though plaintiff claimed that her supervisors yelled at her, gave her poor evaluations, told her she was incompetent, and insisted that she work with an injury).

Counts VI and VIII, retaliation claims brought under Title VII and the ADA, respectively, must be dismissed because Plaintiff fails to provide any evidence of retaliation. The parties agree that Plaintiff's employment was not terminated; rather, she resigned. While Plaintiff argues constructive discharge, she brings no evidence thereof.

Title VII retaliation claims may be established by two methods: by "ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue," or if such evidence is lacking; and under the burden-shifting framework articulated in McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 802-804 (1973). Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999) (citation and internal quotation marks omitted). The ADA imposes a comparable standard of proof. See, e.g., Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 154 (4th Cir. 2012).

Here, Plaintiff fails to provide any direct proof of a retaliatory motivation, which would require non-existent "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Brinkley, 180 F.3d at 607. Therefore, Plaintiff must proceed under the McDonnell Douglas scheme. Under that method of proof, the plaintiff must first establish a *prima facie* case of retaliation, and if successful, the burden then shifts to the defendant to provide a legitimate, non-retaliatory reason for the employment action. See Brinkley, 180 F.3d at 607. Once the employer meets its burden, the plaintiff must provide evidence that the defendant's stated reason is mere pretext for a retaliatory motivation. Id. Ultimately, to defeat a motion for summary judgment, the plaintiff must establish "a prima facie case of discrimination, combined with evidence from which a jury could conclude that an employer's proffered justification was false." Burgess v. Bowen, 466 F. App'x 272, 277 (4th Cir. 2012).

To establish a *prima facie* case of retaliation under the McDonnell Douglas framework, the plaintiff must show: (1) that she engaged in a protected activity; (2) that the employer took adverse employment action against her; and (3) that there existed a causal connection between the protected activity and the adverse action. See Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 242 (4th Cir. 1997). Retaliation claims are subject to a higher "but for" causation standard under which Plaintiff must show the causal link between her protected activity and the adverse employment action she suffered is so close that the adverse action would not have occurred but for the protected activity. See Univ. of Tex. Sw. Med. Ctr. v. Nassar, __ U.S. __, 133 S. Ct. 2517 (2013). Plaintiff makes no such showing.

Protected activity within the meaning of Title VII includes opposing discriminatory practices or participating in any manner in a Title VII investigation, proceeding, or hearing. Kubicko v. Ogden Logistics Servs., 181 F.3d 544, 551 (4th Cir. 1999). The adverse action need not be an ultimate employment decision, but must be "materially adverse," meaning "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotations and citations omitted). To establish an adverse employment action, Plaintiff

17

must show discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating. See Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981), cert. denied, 454 U.S. 892 (1981); see also Von Gunten v. Maryland, 243 F.3d 858, 865-66 (4th Cir. 2001). Moreover, to state a claim of retaliation, an employee must be complaining of an unlawful employment practice or actions the employee reasonably believes are unlawful. Jordan v. Alternative Resources Corp., 458 F.3d 332, 338-39 (4th Cir. 2006).

Prohibitively, Plaintiff fails to show that she suffered any adverse employment action. Following Plaintiff's August 2013 report about Mr. Evo, she was placed on paid leave. Paid leave is not an adverse employment action. See Von Gunten, 243 F.3d at 869 (holding that "placing [an employee] on administrative leave with pay for a short time to allow investigation" is not an adverse action for retaliation purposes), abrogated on other grounds by Burlington, 548 U.S. at 60. While Plaintiff received verbal and written counseling about her improper workplace behavior, none culminated in an adverse employment action. See, e.g., Adams v. Anne Arundel Cnty. Pub. Sch., 789 F.3d 422, 429 (4th Cir. 2015). In Adams, the Fourth Circuit affirmed a grant of summary judgment for the reason that "neither the written nor

the verbal reprimands qualify as adverse employment actions, because they did not lead to further discipline." Id.

Plaintiff's three-day paid suspension in April 2014, likewise, does not constitute an adverse employment action. A paid suspension is neither a refusal to hire nor a termination, and by design it does not change compensation. Nor does it effect a "serious and tangible" alteration of the "terms, conditions, or privileges of employment." Storey v. Burns Int'l Security Servs., 390 F.3d 760,764 (3d Cir. 2004). "[T]he terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances," Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006).

Even if Plaintiff could demonstrate that she suffered an adverse employment action, to be able to make out a causal link she must first allege facts showing that the person who made the adverse decisions knew of her complaint; there is no such evidence here. See Price v. Thompson, 380 F.3d 209, 212-13 (4th Cir. 2004). Even if she could, there is no record evidence that Mr. Garcia—who issued all of the discipline, including the suspension Plaintiff received—knew about her protected activity. Mr. Garcia did not become employed at DLA until December 2013; Plaintiff made her allegations about Mr. Evo in August 2013. Because Plaintiff fails to demonstrate any adverse employment

action, the retaliation analysis ends here. Counts VI and VIII
cannot stand. Defendant Didlake, Inc.'s Motion for Summary
Judgment should be granted. An appropriate order shall issue.


*Claude M. Hilton*
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
July 7 , 2016

20